J-S38034-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.P., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1033 WDA 2021 |

Appeal from the Order Entered August 3, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000179-2020

BEFORE:   BENDER, P.J.E., DUBOW, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED: FEBRUARY 18, 2022**

A.W. ("Mother") appeals from the August 3, 2021 Order of the Court of Common Pleas of Allegheny County Orphans' Court (trial court) terminating her parental rights to C.P. ("Child").[1]  We affirm.

We glean the following relevant facts and procedural history from the trial court's opinion ("TCO") and the certified record.  In May 2019, the Allegheny County Office of Children, Youth, and Families ("OCYF") filed a dependency petition for Child after he was removed from his parents' care pursuant to an Emergency Protective Order.  Child was admitted to UPMC Children's Hospital of Pittsburgh on May 18, 2019, after police responded to

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court also terminated the parental rights of F.P. ("Father") and of any unknown father of Child (Child's birth certificate did not list a father). Father was determined to be Child's biological father by entry of a court order on April 22, 2019. Father did not file an appeal.

Mother's home to escort her and Child to the emergency room at UPMC Children's Hospital of Pittsburgh. At the hospital, Child underwent a standard nonaccidental trauma workup due to a concern for potential abuse or neglect, and was diagnosed with poor weight gain, failure to thrive and, following an MRI, a retropharyngeal abscess in his throat. UPMC Children's Hospital of Pittsburgh CAC Inpatient Consult. Legal custody of Child was transferred to OCYF at a May 24, 2019 shelter hearing, with permission to place Child into foster care upon his discharge from the hospital; parents were granted supervised visits with Child. Following an adjudicatory hearing, Child was found Dependent on August 13, 2019 and ordered to remain in his foster care placement. Permanency hearings were held on November 13, 2019, May 12, 2020, August 19, 2020, and February 3, 2021, each of which resulted in an order for Child to remain in foster care. A termination petition was filed on November 24, 2020. Termination proceedings were held on May 7, May 28, and July 29 of 2021.

> [Child] was born on February 7th, 2019. After his birth [Child] was admitted to the NICU to be withdrawn from Subutex, a substance that Mother had been prescribed during pregnancy. It was noted that he was a healthy weight at the time of his birth. [Child] was seen at Community Pediatrics in Brentwood, Pennsylvania for routine follow-up appointments after his birth. During these routine appointments, the pediatricians became concerned about [Child]'s poor weight gain. The medical records, as reported by pediatrician, Dr. Levin, noted that [Child] was only in the third percentile for his weight as compared to other children his age. As a result, weight checks were scheduled every few days so that the office could monitor [Child]'s growth. At an appointment on May 14, 2019, [Child]'s weight had dropped to the first percentile.

The pediatrician at that appointment requested that [Child] return to the office for another weight check a few days later.

On May 17th, 2019, Mother appeared with [Child] for a weight check, and he was seen by Dr. Kenneth Levin. [Child] weighed 9 pounds and 7 ounces at the time of the check which was well below the expected weight of 12 pounds for a child his age. Dr. Levin advised Mother to take [Child] to the Emergency Department at Children's Hospital based on the doctor's recent observations of recent weight loss and the overall appearance of [Child] at the appointment. Later in the evening, Dr. Levin contacted Children's Hospital to inquire if [Child] had been examined by emergency room physicians. The hospital advised him that [Child] had not been to the emergency room. Dr. Levin reported that he became concerned for [Child]'s welfare based upon his prior experiences with the parents and their lack of follow through at previous appointments. The doctor testified that he drove to the address listed for the family to physically check on [Child]. No one answered the door, and the doctor went home. The next morning, Dr. Levin called Children's Hospital to inquire if [Child] had been admitted to the Emergency Department overnight. Children's Hospital reported that [Child] had not been seen overnight and Dr. Levin called 911 to conduct a welfare check on [Child]. Dr. Levin reported that he had never driven to a patient's home or contacted 911 to conduct a welfare check in his entire career. He took such drastic action because he knew that the parents had another child who died unexpectedly at age three months. He reported that this child also had a history of poor weigh[t] gain. Mother and [Child] were eventually located by police the next morning. Mother agreed to travel with [Child] by ambulance to Children's Hospital Emergency Department.

T.C.O. at 3-4 (citations omitted).

Myia Weisend (Weisend), a caseworker at OCYF testified that the ChildLine report filed while Child was hospitalized indicated he was underweight and that Mother and her family members had not been cooperative in locating Child prior to his admission to Children's Hospital; she stated that Child was transferred to pediatric intensive care on the day

following his admission and remained there for twelve days, after which he was transferred to the Children's Home for stability and rehabilitation. N.T., May 7, 2021, at 28. Dr. Maria Antonucci, who performed a child advocacy consult on May 20, 2019, testified at the May 28, 2021 hearing that during an MRI performed following admission, a retropharyngeal abscess was found that required surgical drainage. N.T., May 28, 2021 at 91. Dr. Antonucci described this abscess as a bacterial infection usually preceded by a cold and opined that it probably developed at some point in time in the 24-48 hours before Child developed a temperature, on May 17, 2021. *Id*. at 97. As part of her consult, she interviewed Dr. Levin, who reported to her that upon his examination on the evening prior to admission to the hospital, he found Child to be breathing rapidly and to be very thin in appearance, having lost five pounds since the prior weight check. *Id*. at 93, 98. Dr. Antonucci further testified that Child had an extensive workup for his failure to thrive diagnosis, and a predisposition for aspiration was found, with some airway intervention. *Id.* at 100, 101.

The trial court iterated the conditions that caused Child to come under care, and for which Child will continue to require attention:

> [Child] has several medical issues including his short stature, a failure to thrive diagnosis, dysphagia, and a speech delay. He is being monitored by genetics, endocrinology, gastroenterology, and the Feeding and Swallowing Center at Children's Hospital. [Child] works with a speech therapist, a nutritionist and should be working with an occupational therapist.

T.C.O. at 12.

Foster mother, who is a registered nurse, testified regarding Child's ongoing medical needs:

> [Child] has what is called short stature which means he's not gaining height as he should, given his parents' height and his birth length. For that, he is followed by genetics, endocrinology, and he's also followed by a GI because he's also failure to thrive meaning that he's got lower weight gain than expected for the amount of calories that he consumed and for his birth weight for his trajectory and for that he sees GI, as well as endocrinology.
>
> He's also followed by the Feeding and Swallowing Center at Children's Hospital because he has dysphagia which is a fancy way of saying he aspirates when he swallows. He also has a speech delay that we're working with Early Intervention.

N.T., May 28, 2021, at 46.

OCYF caseworker Weisend testified that Court-ordered goals established for Mother included: compliance with drug and alcohol treatment,[2] cooperation with In-Home Services, resolution of any criminal matters, completion of individual and interactional forensic evaluations and follow-through with any evaluations, and attendance and completion of coached

_____

[2] Mother contracted Lyme's disease in her early twenties; she developed a dependence on opiate medication prescribed during treatment and has been taking Suboxone (or Subutex during her two pregnancies) for ongoing pain and opioid dependence for ten years. N.T., May 7, 2019, at 31, 235. Since 2014 she has received maintenance treatment at A&R Solutions, a Suboxone clinic, where she undergoes scheduled urine screening. *Id*. at 31. She has received diagnoses, and undergoes treatment with a psychologist for, panic disorder, unspecified depressive disorder, and opioid dependence. *Id.* at 129. She confirmed that she has rheumatoid arthritis, degenerative disc disease, sciatica and gastrointestinal issues. *Id*. at 120.

parenting classes. N.T., May 7, 2021, at 29. Weisend testified that Mother began to work with In-Home Services in July 2019 for help in establishing her goals, as well as help with coached parenting and assistance in getting to court-ordered urine screenings. *Id*. at 32. She stated that Mother completed initial intakes with In-Home Services, but was inconsistent thereafter; Mother engaged with Coached Parenting services from a program called "Project Star" at first, but she and Father were subsequently discharged from the program for noncompliance, having completed only 6 out of 18 classes. *Id*. at 38-39. Weisend testified that OCYF's greatest concern continues to be that Child's medical needs will not be addressed.

> [Child] has a lot of doctors and a lot of specialists, but it's more so keeping up with all of those doctors and specialists. Making sure he is following through with all of his services. [Mother] talks with nutrition, but she is not consistent with nutrition. She talks with speech, but she was inconsistent with speech in the beginning. Sometimes she is late to the sessions. Sometimes she is late to the doctor's appointments that she is going to, which is all concerning because if [Child] wasn't there on time, he is not going to be able to be seen by those specialists.

*Id*. at 56. In response to a question regarding whether the parents understood how significant Child's needs are, Weisend stated "they have downplayed his needs. I do believe that [Mother] understands the [Child] has medical issues, but she does not take the urgency to address all of it." *Id.* at 107.

Dr. Eric Bernstein, who provided Mother's mental health assessment, testified that Mother reported that she told Dr. Levin that she wanted to wait a day before taking Child to the emergency room, and that she would take him to West Penn Hospital rather than to Children's Hospital, and that they agreed to this plan. N.T., May 7, 2021, at 178. Mother also testified that she told Dr. Levin that she was going to wait until the next day and take Child to West Penn Hospital, and Dr. Levin "seemed fine with that." *Id.* at 224. Conversely, during his testimony, Dr. Levin stated that when he treated Child on May 17, 2019, Mother did not tell him that she wanted to wait, and to take Child to a different hospital the following day. *Id*. at 23. Dr. Levin testified that he was very clear about the need for Child to be taken to the emergency room; he "asked [Mother] particularly whether she had a ride to go, and she said she did." *Id*. at 8. Dr. Bernstein testified that Mother and Father explained their involvement with OCYF by claiming they have been unfairly victimized by several individuals and entities including, but not limited to, Dr. Levin, Children's Hospital, and OCYF. *Id*. at 136. He stated that Mother's position, to a degree, is that Child's health issues, whatever they may be, are not as serious as reported, and that she questions the motivations of the foster parents. *Id*.

The trial court provided a lengthy summation of the testimony regarding Mother's record of attendance at Child's doctors appointments, delineating appointments on December 10, 2019 (Child arrived on time with foster parents; Mother arrived 1 hour and ten minutes late, and Mother declined

opportunity to feed Child); December 27, 2019 (foster mother reported that she had to schedule appointment after Mother failed to do so and Mother failed to appear for appointment); February 7, 2020 (Mother did not attend for twelve-month checkup); March 10, 2020 (Mother appeared on time but did not remain for bloodwork); March 24, 2020 (Mother declined to virtually participate for endocrinology appointment during Covid-19 outbreak); March 31, 2020 (Mother did not attend appointment with cleft craniofacial specialist); June 11, 2020 (Mother appeared twenty minutes late for appointment with feeding specialist); June 25, 2020 (Mother appeared twenty minutes late for appointment to participate in swallow study); July 2, 2020 (foster mother reported that Mother failed to schedule appointment for several weeks and appeared late); August 27, 2020 (Mother arrived late for endocrinology appointment); September 1, 2020 (Mother arrived late for endoscopy procedure and left waiting room after being instructed not to do so missing opportunity to discuss results with doctor after procedure); December 9, 2020 (Mother failed to attend feeding evaluation virtually); December 17, 2020 (Mother appeared late for endocrinology appointment); December 18, 2020 (Mother was twenty-five minutes late for hearing check); February 10, 2021 (Mother appeared late for two-year wellness check); and April 14, 2021 (Mother failed to attend weight check). T.C.O. at 5-9 (citations to N.T. omitted).

Following the August 13, 2019 adjudicatory hearing, Mother and Father were ordered, *inter alia*, to work with In-Home Services, attend supervised

visits with Child consistently, comply with random urine screens, maintain stable housing, and to ensure that all of Child's medical needs were met. August 13, 2019 Order. At the November 13, 2019 permanency hearing, the trial court found Mother to be in moderate compliance with the permanency plan, as she had maintained contact with OCYF and had been visiting Child. However, the court order reflected that she had not attended drug screens consistently and had declined to participate in a parenting program. November 13, 2019 Order. The trial court found Mother to have minimally complied with her permanency plan on May 12, 2020, for not consistently meeting with In-Home Services and having been dismissed from the Coached Parenting program. May 12, 2020 Order. At the August 19, 2020 permanency hearing, Mother was again found in minimal compliance; she was ordered to continue drug and alcohol treatments and random drug screens and attend to Child's medical appointments. August 19, 2020 Order. On February 3, 2021, Mother was again found in minimal compliance, as she had not visited or attended Child's medical appointments consistently. February 3, 2021 Order.

The trial court issued an Order terminating Mother's parental rights on July 9, 2021.[3] After extensively reviewing the evidence, it held that termination was justified under 23 Pa.C.S. §2311(a)(2), (5), and (8) and that terminating said rights served the needs and welfare of Child under subsection

---

[3] The trial court also terminated Father's parental rights, under 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8), as well as subsection (b).

(b) of the statute. Mother timely appealed, and Mother and the trial court have complied with Pa. R.A.P. 1925.

On appeal, Mother argues that OCYF did not provide clear and convincing evidence to terminate her parental rights.[4] Mother asserts that OCYF did not provide clear and convincing evidence to establish grounds for termination under subsections 2511(a)(2), (5) and (8).[5] She argues that she

_____

[4] We review the trial court's decision for an abuse of discretion. **In re G.M.S.**, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted). Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." **In re Interest of D.F.**, 165 A.3d 960, 966 (Pa. Super. 2017). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." **In re S.H.**, 879 A.2d 802, 805 (Pa. Super. 2005). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re A.S.**, 11 A.3d 473, 477 (Pa. Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." **Id.**

[5] Those provisions provide:

(a)  General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds

       -     -     -

   (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent

       -     -     -

   (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of six months, the conditions which led to the removal or placement of the child continues to exist, the parent cannot or will

*(Footnote Continued Next Page)*

has made significant progress in recognizing and attending to Child's needs, citing her testimony that she schedules all of Child's medical appointments except for sick visits, and she does not need to be reminded to schedule appointments. N.T., May 7, 2021, at 245, 285. She submits that she has been fully compliant with the majority of her family service plan goals, including compliance with drug and alcohol treatment, completion of a POWER assessment, cooperation with In-Home Services, completion of individual and interactional forensic evaluations, and attendance at parenting classes. Mother acknowledges that she has missed the majority of her random urine screens but asserts that she did provide a full history of negative screens from her Subutex maintenance program; she argues that the trial court should have focused not on whether or not she is able to attend screens, but rather on

---

not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs of the child.

- - -

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2311(a)(2), (5), and (8).

whether or not she has maintained her sobriety throughout the pendency of this dependency action.

"The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [the subsections of 23 Pa.C.S. § 2511(a)]." *In re Adoption of J.N.M.*, 177 A.3d 937, 942 (Pa. Super. 2018) (quoting *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Clear and convincing evidence is that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re D.L.B.*, 166 A.3d 322, 326 (Pa. Super. 2017) (citation and quotation marks omitted). The court may then enter a final decree of involuntary termination if it is in the child's best interests as outlined in Section 2511(b). *Id.*

OCYF alleged that Mother parental rights should have been terminated pursuant to subsections (2), (5) and (8) of Section 2511(a). However, when reviewing a trial court's order terminating parental rights, we need only agree as to one subsection of Section 2511(a), as well as Section 2511(b), to affirm the order. *In re B.L.W.,* 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we will focus on subsection 2511(a)(8)'s requirement that the conditions leading to Child's removal continue to exist for 12 months or more.

Termination under subsection 2511(a)(8) does not require consideration of the parent's willingness or ability to remedy the conditions that led to the child's placement if the conditions continue to exist. *In re Adoption of R.J.S,*

901 A.2d 502, 511 (Pa. Super. 2006). Even if a parent has made progress in remedying the conditions and could potentially parent the child successfully in the future, termination is justified if the conditions continue to exist after 12 months in placement and it would serve the needs and welfare of the child. *In re S.H.,* 879 A.2d 802, 806-7 (Pa. Super. 2005). By allowing termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that "a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *R.J.S.*, 901 A.2d at 502, 513.

It is undisputed that here Child was in placement for over 12 months, as approximately two years elapsed between removal of Child from his parents' care and the initial termination hearing. In finding that the conditions leading to Child's removal persisted beyond 12 months, the trial court opined:

> Mother's most important goal was to engage in [Child]'s medical care and to ensure that his medical needs were being met…It has been reported that Mother has continuously had to be prompted to make medical appointments for [Child]. The foster mother reported that out of thirty-one appointments, the birth mother has scheduled only fifteen. Out of those fifteen scheduled appointments, Mother had to be prompted numerous times to schedule at least six of those appointments. In addition to scheduling these critical appointments, the court and OCYF expected Mother to attend the appointments.
>
> Since December of 2019, Mother has attended twenty-four out of thirty-one medical appointments. Punctuality has also been a concern as Mother appeared late for many of the appointments.

The foster mother reported that Mother has been on time for fourteen appointments and late to ten appointments.…Mother has the option to attend [Child]'s speech appointments virtually but has not attended them consistently and often joins sessions late.

T.C.O at 12-13 (citation omitted).

The record supports the trial court's determination that the conditions leading to Child's placement continue to exist. We find it significant that Mother's inconsistency has continued after the termination petition was filed and up until the time of the hearings. In addition to her demonstrated inability to meet Child's medical needs, Mother has also not been successful in meeting other court-ordered goals. She asserts that OCYF should accept the results of drug screens from her suboxone clinic but admits that the screens there were not random; she missed twenty-nine random drug tests and failed to provide urine samples on seven separate occasions. *Id*. at 14. Here, the trial court found that the conditions which led to Child's removal continue to exist, and that Mother cannot or will not remedy those conditions within a reasonable period of time. *Id.* at 15. It further opined that "the services reasonably available to Mother are not likely to remedy the conditions which led to removal." *Id.* Based on the foregoing, we find that the trial court did not err or abuse its discretion in finding that the statutory grounds for terminating Mother's parental rights pursuant to Section 2511(a)(8) were established through clear and convincing evidence. *See In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019).

Since a court must engage in a bifurcated process prior to terminating parental rights, *id.*, we next consider Section 2511(b), which provides:

> The court in terminating the right of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re G.M.S.*, 193 A.3d 395, 401 (Pa. Super. 2018) (citation and internal brackets omitted) (some formatting).

In regard to Section 2511(b), the trial court found that based upon the reports of Dr. Bernstein, the court ordered psychologist, as well as the caseworker and service providers in the case, the foster parents offered love,

comfort, security and stability for Child and that it was in his best interests to be adopted by them. Notably, the trial court stated in its opinion that:

By all reports, [Child] is comfortable in Mother's presence, and she is attentive to his needs during her periods of supervised visitation. She has always been appropriate in the interactional evaluations conducted by Dr. Eric Bernstein, the court ordered psychologist assigned to evaluate the family. When questioned about the bond between [Child] and Mother, he described the bond as being "important". Dr. Bernstein opined that [Child] could experience a sense of loss if his parents were removed from his life but reported that the foster parents could "compensate for their absence, by providing continued stability, love and appropriate care".

[Child] has been in the same foster home since June of 2019. Foster mother has presented as knowledgeable and involved in [Child]'s medical care. The OCYF caseworker reported that [Child] is bonded to his foster parents and appears comfortable in their home. She further reported that the foster parents have been meeting [Child]'s medical, educational, developmental and emotional needs. Caitlyn Larkin, the foster care caseworker from Every Child Inc., also testified that [Child] was very bonded to his foster parents. Dr. Bernstein conducted an interactional evaluation with the foster parents and [Child] in 2020. Dr. Bernstein opined that the bond between [Child] and his foster parents was "important and significant". He further reported that [Child] looks to the foster parents to fulfill his needs and due to the consistency of their care, he has developed a healthy, and secure bond with them.

The court recognizes that [Child] may experience negative emotional consequences if his contact with Mother were to cease. However, the court found that termination of that bond would not destroy an existing, necessary and beneficial relationship. The court further finds that the foster parents could provide the emotional support required for [Child] to process the loss of the bond with his Mother.

T.C.O. at 16-17. The trial court also considered the safety needs of Child, noting that his health concerns are so serious that any deviation from his current array of services could have catastrophic effects on his health. It emphasized the fact that Mother has consistently downplayed the severity of her son's health issues and failed to schedule critical appointments. We agree that based upon the evidence presented, termination of Mother's parental rights would best suit the developmental, physical and emotional needs and welfare of Child as required by Section 2511(b). The trial court therefore did not abuse its discretion by terminating Mother's parental rights to Child. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/18/2022